We have one case scheduled for oral argument this afternoon. Team Hall Venture, LLC v. Army and Air Force Exchange, docket 18-2283. Mr. Creedon, you're reserved five minutes for rebuttal. Is that correct? Yes, Your Honor. Okay, you may proceed.   You may have pleased the Court. Good afternoon, James Creedon for Team Hall Venture, LLC. I'd like to start by thanking the Court and opposing counsel for your indulgence in recalibrating this argument due to weather conditions last month in my home state of Texas. So before the Court today is the question of ambiguity in the language of a release signed by Mr. Hall for Team Hall Venture. And turning to Supplemental Pentatex 15, that's actually the copy of the amendment of the solicitation contract with the actual language that was signed. I understand, of course, that at the Board there was a quotation of the release, but the larger language from that release is there at Supplemental Pentatex 15. And the contention today is that Phrase C, which is the release that was cited to you by the Board in its decision, is in fact ambiguous and is ambiguous on its face. And that is because that phrasing should be interpreted in the context of the larger document itself that is within the four corners of the document. So why, to include the time period of 1 to 17 July 2016, why could that possibly be a limitation? I see no reasonable basis for saying that. The term include is open-ended. It doesn't say limited to. It doesn't say including this but excluding anything else. It says to include. Your Honor, turning to Section B, which is in that same document, Section B provides a context for what the language of Section C means. In terms of looking at the language itself word for word, if we parse down every single individual word, first considering the word within the context of the larger contract, we could find all sorts of interpretations. But looking at Letter B, there was already a termination that was in place of the contract. The contract was already set to terminate on July 17, 2016. Here, the language in this amendment speaks to the change of that termination date from July 17, 2016 back to June 30. And so looking at the way that the phrasing reads, that phrasing in fact only speaks to that period because the very purpose of this amendment was to change from a July 17 termination date to a June 30 termination date. Therefore, when it says to include the time period of 1 to 17 July 2016, that's the only time period that's intended to be included. Well, maybe you can sell that somewhere. I mean, isn't the more logical reading is that the government was worried that since they were agreeing to terminate it early, your client might come back to them for some kind of claim for the period that it had originally agreed to be bound to because of the 90-day termination clause. So they wanted to make it clear that this waiver included post-termination periods after June 30. Which is what they were now agreeing to, in addition to all claims related to the pre-June 30 termination. Well, Your Honor, in terms of the government's goals and such, that is revealed by the emails at Supplemental Appendix 36 and 37. Well, I know you want us to look at all the extrinsic evidence here, but the problem is we don't get to any of that if we find this is plain. And it's a pretty standard release clause that adds on, I mean, this is in almost every government contract where you have some kind of termination, agreed termination or the like, and all they've done is add on a specific thing, emphasizing that it includes this post-termination period as well. I don't see how that makes it unplain, it just makes it more specific. Well, I believe, Your Honor, that if looking at, for example, the transcripts from the board proceeding, certainly there was some confusion within that proceeding as to what the phrasing meant. It wasn't intuitively obvious at the moment. The question was posited at one point to Captain Williams, what does that term mean? And the response was he believed it was intended to apply to 1-17-July only. Now, of course, that does not bind... I mean, our job is not to look at the subjective beliefs in the extrinsic record. Our job is to look at the plain language of this and see whether it is indeed plain and unambiguous or not. So the fact that one of the government counsel may have believed one thing, they certainly changed their position by the reply brief at the board, I think. You know, it may be unfortunate that this is the way it occurred, but again, isn't this a standard release clause? I mean, everything up into that last phrase looks like something I've seen hundreds of times, and then it adds on a specific period. I don't know how making it more specific somehow renders it ambiguous. Well, frankly, I think looking at the larger intent of the contract as a whole, to which this was an amendment, the intent was to structure the relationship between AFIES or the exchange and Dean Hall Venture. The intent here was to change from one previous termination date to another termination date. And so that phrase of including, at the very least it would be an artful drafting that raises some questions, but I would argue that that phrasing, read within the context of letter B, about the change from July 17th to June 30th as the termination, is exactly what creates the ambiguity. That there is sufficient indicia of ambiguity that the court should look through and look to the intent of the parties in order to facilitate the intent of the larger contract in the amendment. I know he initially got about, what, like $30,000 to settle this contract out. And he was originally seeking $640,000 and dropped it to $240,000. Do you have any insight on how much of that $240,000 still contains future lost profits? I don't have down to a dollars and cents. I don't have it down to dollars and cents, Your Honor. What I will say is I believe that that has been a moving target, certainly the amount claimed, depending upon different ways of changing up those amounts. For example, if you look at the amount that APHES, that the exchange had said in its last offer, which was continuing on the months after this termination, that was based upon a way that some of the money had been handled in dividing up the entire contract period. Now, certainly in question of how much dollars are being claimed or how much is being awarded speaks to the fact that there was an ongoing claim process here where the exchange certainly seemed to believe that this was not a waiver of claims going forward past July 7th. Why did you make that argument in your briefing? Well, Your Honor, I tried to make the argument more generally and trying to speak to it more specifically now as it was raised at the lower proceeding as it's shown in the transcripts and as it's shown in the briefing that was filed by Mr. Hall on behalf of Dean Hall Venture at that time. There's been a consistent argument made from the beginning that this language... I know that there's been an argument that this is ambiguous and this is not what's intended, but I don't know if you're alluding to our line of cases that suggest that even with releases, they're sometimes not enforceable if it's clear from the government's context that they intended to go on and do that. You didn't cite any of those cases in your brief, did you? I did not, Your Honor. No, that's correct. Those were raised in the lower briefing and they are shown in the record. And certainly we've suggested in the briefing that there's a larger question here of whether it's limited to this time period or not and what the intent was of the parties. So if the court sees fit to pierce through and to say that there is some ambiguity here, there's certainly a question of the intent of what was intended by both sides in the meeting of the minds for this contract. And looking at the record, it's clear from both the email proceedings back and forth between the contracting officer and Mr. Hall and also from the ongoing handling of the claim by the exchange that there was an intent this would be limited to a shorter time period. If that's not the intent, then certainly what happens is Team Hall said that they would shorten up their period by 17 days. The government seemed to concede and agree that shortening it by 17 days was appropriate and would allow for the stop of ongoing losses and the development of ongoing claims. Once that happened, the government would continue to handle the outstanding claim that was present before APHIS. And that is why for the months afterwards, there's a continuing handling of that claim, continuing negotiations. And so the overall record shows that the intent of both sides was to limit this waiver to the time period between 1 and 17 July of 2016. Okay, let's see it from the other side. Yes, sir. May it please the Court. The issue before the Court is the plain language of a contract. Paragraph 4C of what we call the termination agreement is a broad, unrestricted general release clause. I have another question for the government. Yes, sir. If you file a brief in this Court, it wasn't very long, 12 pages. It's missing page 11. I'm sorry, sir. What you're saying is that page 11 of the Appley's brief is missing? Yes. I'm not aware of that. I do have a copy. The paper copies you filed with us don't have page 11. My apologies. Yes, I do have page 11 of the electronic. So we're missing about two paragraphs. That's a classic waiver of argument, too. No, I apologize. I was not aware of that. Does somebody proofread these things? We have paralegals. I apologize on behalf of my office. But I leave it to the courts. You might take back and suggest that the paper copies get compared to electronic copies. Yes, this is a problem that should not have happened. I'm sure I'm aware of the situation. Did you get a page 11 in the brief? Your Honor, in the electronic form, yes, I have a page 11. This is just a printing error in filing the paper copies. Well, don't worry about it, because Judge Reynos instructed me on how to do the electronic. Can I ask you what I was asking him? I know this is not before us, but they ultimately got roughly $30,000. They reduced their claim from $640,000 to $240,000. Do you have any insight? I know this is not particularly in the record, but how much of that $240,000 was still seeking lost profits for the terminated period? Yes, so the contracting officer made an offer of approximately $29,000 to settle the claim. Had they accepted that? They did not accept it, and that's in the final decision during a conference call. If they lose this, they can still get the $29,000? Yeah. It's in the final decision. There was a conference call, and the appellant declined that offer. The bulk of the claim was for future lost sales. So in the papers before the Board, the appellant adjusted their... Which is probably hard to get when they're the ones that asked for the early termination. I mean, I know this is none of us before, but I mean, it does seem like there's a little bit of this is a very small government contractor that may not have intended to sign away his claim, but I'm just trying to get at how much of his actual out-of-pocket costs due to the flooding and the road infestation was covered by that $30,000 offer, and how much of what he's additionally asking for is future lost profits post-termination? Yes. So this can be determined, I think, best from the final decision. And what the contracting officer did was to deny some $624,000, which was loss of future sales. And the $29,000 were for what were termed build-out costs. So these were improvements, electrical work, plumbing, that the team hall did to the facility. Also losses due to the road infestation and the flooding due to no fault of either party, and the contracting officer specifically said, in the interest of resolving the claim, we make this offer of some $29,000 to help him out, and that was turned down. But I believe that in the brief to the board... I just want to make it clear, because I think you said this, but assuming you prevail here, that's still the final decision, and even though they haven't accepted it yet, that's presumably still available, and if they... Yes, that is the final decision. The government will cut him a check for that amount if they ask for it. So it is our position that... Yes, sir. I just want you on the record that you're going to give them their money if they lose this appeal. That's right. That would be at issue in that final decision. It is our position, however, especially in light of the fact that the appellant turned down that offer and decided to litigate this. This language is plain. It is not ambiguous, and the appellant's argument that the effective date of the release was only for a brief 17-day period is not reasonable, and it's not supported by the plain language. Wait a minute. That was one sentence. It began with, it would be our position, and it was in response to, and followed your statement, yes, as to the $29,000 still being available. Are you saying it's not, or are you just saying they have a bad argument? No, in the alternative, if the court were to fine for the appellant, that is the amount in the final decision that was offered. You're not going to use this release language to turn around and say, oops, we shouldn't have given you the $29,000. Actually, it's the government's position that based on this... You really shouldn't ask for more than you should get here. You just answered that it was the final decision. I'm sorry. I mean, it was issued after this amendment, so right? Yes, and it's our position with respect to the government. There is certainly authority that if the government entertains a claim following a general release, that vitiates the release. But this was not an issue raised before the board, and it's not in their opening brief. This argument is waived. Sure. Can we just ask you one more time? Yes, sir. And I think you've already answered this, but then you muddied the waters. If they lose, you've given them a final decision awarding them roughly $29,000. Are you going to pay that money, or are you now going to use our decision here and the board's decision to say you're not even entitled to that $29,000? Well, Your Honor, I believe that the result is in light of the fact that they decided to challenge this, and they turned down that offer. Yes, they get nothing. That's an appropriate result. Well, how is that? I don't understand how just as a matter of law that's correct. When this decision issued after this amendment and release, if it had issued prior to the amendment and they turned it down and then you issued the amendment and released just cutting it off, that would be one thing. This post-dates the release, so at least this decision clearly contemplated, even in light of this release, giving them $29,000. You are digging yourself a hole here that you don't want to dig. I hear a voice saying, I am the great and powerful laws. I'll take that. Or the government, as it were. You are digging yourself into it. I will try not to dig myself further. I understand what the court is saying. Anything else? Subject to the court's questions, I have nothing further.  Mr. Creighton, you have all your rebuttal time available. Thank you, Your Honor. And if you come up here and say we wouldn't take the $29,000 if it was offered to us on a gold platter, I'm leaving. I certainly will not say that, Your Honor. I unfortunately will say something that there seems to be a little bit of a logic trap, which is that, yes, that offer was made after the amendment was issued, but after this language was signed, then the question becomes, if that offer was made after this was signed, is that an outstanding and proper offer in response to a claim? And if it is in response to a claim, then can that claim, if not, be properly appealed? Your Honor, we have lots of cases about vitiating release language, but you didn't make that argument in your blue brief, and you didn't cite in these cases, and you didn't file a reply brief. So under any notion of waiver, you've waived that, haven't you? Well, it's certainly before the court in that it's been argued by the exchange, and so there's been expansion to some extent. The government proactively responding to arguments that weren't made doesn't excuse you from failing to make an argument and doesn't prevent application of waiver. Understood. Well, certainly, I appreciate the Court's time, and I thank you. Thank you very much.